**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MAMNOON KHAN, on behalf of himself and )
all others similarly situated, )
                                  ) Case No. 1:24-cv-13084
          Plaintiffs, )
                                    )
          v. ) JURY TRIAL DEMANDED
                                    )
SEDGWICK CLAIMS MANAGEMENT )
SERVICES, INC., )
                                    )
          Defendants. )
                                    )
                                    )
                                    )

## <u>CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION ................................................................................1

II.    PARTIES ..............................................................................................................3

III.   JURISDICTION AND VENUE ............................................................................4

IV.   CLASS ACTION ALLEGATIONS ......................................................................4

V.    FACTUAL ALLEGATIONS ................................................................................6

      Plaintiff Mamnoon Khan ......................................................................................6

      The Illegal "No Poach" Agreement ......................................................................9

      Concealing the Illegal "No Poach" Agreement ..................................................12

      Internal Equity and Defendant's Compensation Structure ................................13

      Relevant Antirust Market ...................................................................................14

      Defendant Grows at the Expense of Employees Like Mr. Khan .......................14

      Effects of Defendant's Anticompetitive Agreements on Plaintiff and the Class.........15

VI.   CAUSES OF ACTION .......................................................................................19

      FIRST CAUSE OF ACTION ..............................................................................19

      *(Violations of § 1 of the Sherman Act, 15 U.S.C. § 1, et al.)* ......................19

VII.  PRAYER FOR RELIEF ......................................................................................20

VIII. JURY DEMAND .................................................................................................21

Plaintiff Mamnoon Khan ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), alleges the following against Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick" or "Defendant"), based on personal knowledge, the investigation of counsel, and information and belief:

## I.   SUMMARY OF THE ACTION

1.     Sedgwick is an insurance services company worth over thirteen billion dollars that is owned by one of the wealthiest private equity firms in the world. Its business has grown exponentially as leading insurance companies and Fortune 50 corporations to outsource insurance claims processing to Sedgwick. As explained in detail below, Sedgwick has doubled in value in just six years and has grown by acquiring its rivals.

2.     Sedgwick employees have not shared in this windfall. Indeed, while Sedgwick profits have soared, Sedgwick employees are stuck with stagnant wages due in large part to illegal agreements Sedgwick uses to restrain employee mobility.

3.     Sedgwick has achieved monumental growth on the back of loyal and capable employees such as Mr. Khan. Sedgwick generates industry leading profits. At the same time, Sedgwick salaries lag behind even its most mediocre competitors. How does Sedgwick maintain this grotesque equilibrium? It secretly locks its employees out of advancement opportunities they might be offered by its customers using a web of "no poach" agreements that prevent employee movement to customers of all sizes. These agreements suppress wages for all Sedgwick employees and are *per se* illegal under federal law.

4.     This is a class action on behalf of all insurance adjusters, representatives, investigators or examiners, and related supervisory or support personnel (hereinafter, collectively "insurance professionals") currently or formerly employed by Sedgwick Claims Management Services, Inc. for damages and injunctive relief under the antitrust laws of the United States.

5.     Defendant is the largest insurance third-party administrator ("TPA") and dominates the TPA market. Defendant has maintained its market power by suppressing its employees' salaries with "no poach" agreements. Without the knowledge or consent of its employees,

1

Defendant entered into agreements with many of its clients—for whom they were competitors in the labor market—that imposed unlawful restrictions on employee mobility and had the intended and actual effect of suppressing employee compensation. Defendant's agreements unreasonably restrained trade and are *per se* unlawful under federal law.

6.     Through a series of acquisitions of competitor TPAs, in combination with its unlawful restrictions on employee mobility, Defendant has increased its market power over the provision of third-party administration services and increased the number of workers that are subject to its monopsony power over the employment of insurance claims professionals (including adjusters). In short, the growth Defendant has achieved has been on the backs of its employees such as Plaintiff.

7.     As the Department of Justice Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or "no poach" agreements among employers, whether entered into directly or through a third party intermediary, are *per se* illegal under the antitrust laws."[1] The *Guidance* further elaborates:

> Free and open markets are the foundation of a vibrant economy. Just as competition among sellers in an open marketplace gives consumers the benefits of lower prices, higher quality products and services, more choices, and greater innovation, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.
>
> ….
>
> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for

---

[1] Available at https://www.justice.gov/atr/file/903511/dl (last visited December 3, 2024).

competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[2]

8.      Job-to-job mobility is critical for earnings growth. Free movement of employees to lateral positions at competitors benefits employees and improves the efficiency of labor markets. Yet, Defendant's "no poach" agreements restricted employee mobility and competition in the labor market, allowing Defendant to raise its power at the expense of its employees. Defendant's agreements harmed employees by lowering salaries and benefits its employees otherwise would have commanded in an open marketplace and deprived such employees of better job growth opportunities.

9.      Defendant's "no poach" agreements reflect a naked horizontal restraint of competition in the labor market and are *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.    PARTIES

10.      Plaintiff Mamnoon Khan is an individual who resides in Massachusetts. From 2014 to 2019, Mr. Khan was a claims adjuster employed by York Risk Services Group, Inc. ("York"). In September 2019, Defendant acquired York. As part of that acquisition, Plaintiff and approximately 5,000 other highly skilled professionals employed by York became employees of Defendant. Plaintiff worked as a claims adjuster for Defendant until September 2024.[3] Plaintiff has over 35 years' experience in the insurance industry. Due to his excellent services and universal praise, executives of one of Defendant's clients ("Client A") recommended Plaintiff apply for a substantially higher-paying position with Client A. Client A is among the largest insurance companies in the United States.  Upon applying for the position and after three congratulatory

---

[2] *Id.*

[3] In a September 4, 2019 press release announcing the acquisition, Defendant stated: "The strategic acquisition brings to Sedgwick approximately 5,000 highly skilled professionals serving a variety of clients, including corporations, the insurance industry and public entities. With the close of the acquisition, the Sedgwick family now comprises nearly 27,000 colleagues across 65 countries."  https://www.prnewswire.com/news-releases/sedgwick-completes-acquisition-of-york-risk-services-group-300911569.html

interviews, Client A went dark. Plaintiff later learned, in 2023, that Client A did not hire him solely because of a secret "no poach" provision in its agreement with Defendant.

11.     Defendant Sedgwick Claims Management Services, Inc. is an Illinois corporation having a principal place of business in Memphis, Tennessee. It dominates the TPA market and is the largest provider of TPA services in the United States. Defendant's clientele includes several of the largest insurance companies, such as American Intl Group ("AIG"), Chubb INA Group, State Farm Group, QBE Americas Group, Zurich North America. Defendant has grown through multiple acquisitions of TPA competitors, including its April 2018 acquisition of Cunningham Lindsey and its 21,000 workers[4], as well as the September 2019 acquisition of York (the fifth largest TPA in the United States at the time). Defendant has over 60 offices throughout the United States.

## III.     JURISDICTION AND VENUE

12.     Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendant's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26) and 28 U.S.C. §§ 1331 and 1337.

14.     The Court has personal jurisdiction because Defendant is incorporated in the State of Illinois.

15.     Venue is proper in this judicial district pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because Defendant resides in this district and has offices in Chicago, Illinois and Naperville, Illinois.

## IV.     CLASS ACTION ALLEGATIONS

---

[4] *See* Sedgwick April 16, 2018 press release announcing the acquisition of Cunningham Lindsey (https://www.sedgwick.com/wp-content/uploads/2023/09/SedgwickCLacqClosing_clientbulletin.pdf) (last accessed December 4, 2024).

16.     Plaintiff brings this action on behalf of himself, and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons employed by Defendant in the United States during the period from January 1, 2014 through present (the "Class Period") providing claims adjustment or other insurance or claims-related services, including claims adjusters, investigators, representatives and examiners, and related supervisory and support personnel. Excluded from the proposed Class are Defendant, its affiliates or subsidiaries, its officers and directors, and the Court.

17.     Plaintiff does not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendant. Based upon the nature of the trade and commerce involved, Plaintiff believes that there are tens of thousands of Class members and that Class members are geographically dispersed throughout Illinois, Massachusetts and the United States. Joinder of all members of the Class, therefore, is not practicable.

18.     The questions of law or fact common to the Class include but are not limited to:

    a.  whether the conduct of Defendant violated the Section 1 of the Sherman Act;

    b.  whether Defendant fraudulently concealed its conduct;

    c.  whether and the extent to which Defendant's conduct suppressed compensation below competitive levels for Plaintiff and the proposed Class;

    d.  whether Plaintiff and the Class suffered antitrust injury as a result of Defendant's conduct or were threatened with injury;

    e.  the type and measure of damages suffered by Plaintiff and the Class;

    f.  the nature and scope of injunctive relief necessary to restore a competitive market;

g.  the difference between the total compensation Plaintiff and the Class received from Defendant, and the total compensation of Plaintiff and the Class would have received from Defendant in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein.

19.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

20.     Plaintiff's claims are typical of the claims of the Class;

21.     Plaintiff will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

22.     Plaintiff has retained competent counsel experienced in antitrust litigation and class action litigation to represent himself and the Class.

23.     Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

24.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

25.     Class membership is readily definable, and Class members are easily identified. Records of the names and addresses for members of the Class exist in the files of Defendant.

## V.      FACTUAL ALLEGATIONS

### Plaintiff Mamnoon Khan

26.     TPA services involve the facilitation of insurance policies, and all aspects of administrating, evaluating, and resolving claims under these policies. TPA services also include

related services concerning the scope of coverage, enrollment, and benefits. According to Sedgwick's website: "Sedgwick's delegated authority team works closely with underwriters, brokers and coverholders on all programs providing input on underwriting or policy deficiencies and problematic areas. We'll appoint an account manager as your liaison, ensuring your account receives the individual attention it deserves, and can also create reporting formats that specifically address your needs and requirements. Sedgwick's delegated authority bordereau services enable you or your client to properly identify and manage exposures through complete transparency; these services are captured and compiled in our proprietary claims management system to ensure accuracy. Bordereaux are reviewed by our CPA-led accounting team, further affirming the importance we place on our fiduciary responsibility."

27.    The duties of an insurance claims adjuster, examiner, investigator and/or representative include, among other things, investigating, evaluating and potentially settling claims.   Supervisory personnel provide management and business generation services for Defendant's TPA business. Support personnel, such as secretaries and assistants, support TPAs and their supervisors. Sedgwick also employs nurses, engineers, and IT professionals to support its TPA business.

28.    Throughout the entirety of Plaintiff's employment with Defendant, Plaintiff worked extensively on Client A's account.

29.    At the time Plaintiff applied to Client A in May 2022, Plaintiff was winning accolades from Defendant for his work with Client A. Plaintiff won a Carrier Quality Award for his work, where a Defendant executive noted: "Mamnoon – congratulations on winning the first quarter quality award for your work on the [Client A] file. Your communication with [Client A] and with the claimant has been outstanding and your file documentation is very detailed. You did a great job building a relationship and settling this file to prevent litigation. Thanks for setting a great example for all of us and all your efforts to support the [Client A] program."

30.    Plaintiff worked with experienced Client A attorneys, several of whom went out of their way to make sure that Plaintiff's colleagues from Defendant knew how valuable Plaintiff was

to Client A. One such message, sent in June 2021, illustrates the esteem Plaintiff had earned: "I wanted to express my thoughts regarding Mamnoon Khan. I have been at [Client A] for a little over a year. I am an experienced lawyer, with a busy practice in Los Angeles for over two decades. And, since I got to [Client A], I have learned lots, much of it from Mamnoon. Mamnoon is a very good and dedicated professional. He follows through, as evidenced from the below, which is only one example. Frankly, I have worked at least a dozen Sedgwick representatives and I enjoy working with Mamnoon because of his knowledge, his ability to communicate effectively and efficiently, and is always keeping me on my toes to ensure I am doing the job I am supposed to be doing. This symbiotic relationship is what all Sedgwick representatives should strive to have with their partners. Mamnoon is an asset, and should be treated as one. Many of my colleagues agree!!"

31.     In or around May 2022, Plaintiff—at the repeated invitation of Client A top executives—applied for and interviewed with Client A for a significantly higher paying position.

32.     When Plaintiff interviewed at Client A at the invitation of its top executives, Plaintiff was told that an interview was a "formality" as Client A respected Plaintiff's excellent work. Client A personnel universally sang Plaintiff's praises. In January 2022, Plaintiff was told by Client A employees: "We always talk about the great work you do and the fact that you are the most reliable adjuster we work with." Another Client A employee told Plaintiff in November 2021: "I love your tenacity and professionalism. We need more Mamnoons!!!" This same employee told Plaintiff in August 2021: "I can always count on you, and I hope Sedgwick knows that you are one of the most valued Sedgwick representatives, a notion shared by many people here!!!" In July 2021, a retiring Client A employee told Plaintiff: "You have always been mine and my team's favorite Sedgwick adjuster to work with and wish you all the very best to your future."

33.     Client A's Vice President of Claims shared this high opinion of Plaintiff. In February 2022, he commended Plaintiff on doing an "excellent job" and introduced Plaintiff via email to Client A's head of Casualty Claims, who responded "I have heard wonderful things about you from the team. Thank you for all your efforts!"

34.     Client A's Vice President of Claims instructed another Client A employee to recruit Plaintiff to seek employment with Client A. That employee told Plaintiff the interviews would just be a formality, and that Plaintiff would be hired due to the universal praise from Client A employees. Plaintiff was told the same thing at his interviews.

35.     After some weeks passed, however, Plaintiff became concerned. Plaintiff sent a message to the Client A employee who was instructed to recruit Plaintiff and asked about Client A's hiring process. That Client A employee, equally confused, responded: "I didn't know they had other candidates, but not a 'no' so still hoping you're in the running."

36.     Even after Client A declined to hire Plaintiff, that Client A employee recognized Plaintiff's value as potential Client A employee, stating in April 2023: "I really enjoy all the time and help from you. You are my favorite to work with!"

37.     When Plaintiff was not hired by Client A, he was devastated. The only thing that made sense to Plaintiff was that, consistent with his experience with Defendant, he was being discriminated against because of his race, religion and national origin. Plaintiff initiated action against Client A through the Massachusetts Commission against Discrimination ("MCAD"). Client A defended itself in the MCAD proceeding by claiming that the sole reason Client A did not hire Plaintiff was due to a "no poach" provision contained within the "Master Contract for Claim Handling and Adjusting Services" agreement (hereinafter "the Agreement") entered into by and between Defendant and Client A.

38.     As explained below, Defendant concealed the existence of the "no poach" agreement from its employees. Had Plaintiff not initiated the MCAD action against Client A, the "no poach" agreement would have remained concealed. Defendants told Khan and members of the class that compensation at Sedgwick was "competitive," and that compensation would be driven by factors such as performance and merit. Khan and members of the class were not informed that secret "no poach" agreements prevented them from receiving market value for their services.

**The Illegal "No Poach" Agreement**

39.     According to the one agreement Sedgwick reached with a horizontal competitor in the market for insurance professionals:

> "During the period of this Agreement, and for a period of one (1) year thereafter, neither party shall solicit for employment any employees of the other party contacted during the performance of this Agreement. This provision shall survive the expiration or prior termination of the Agreement."

40.     This agreement is exemplary of the agreements Sedgwick reaches with its clients who are competitors in the market for insurance professionals.

41.     The "no poach" provision covers all employees of Defendant who performed any work—no matter how minimal in scope or duration—on Client A's account. The "no poach" provision is not limited by geography, job function, or status of employment, and it is not ancillary to any legitimate collaboration between Defendant and Client A. Employees were not informed of and did not agree to the restriction.

42.     According to the Agreement, "[t]he relationship between [Defendant] and [Client A] shall not be one of joint venture, partnership, or employment, and nothing in this Agreement shall be construed to create any such relationship between the parties other than that of customer and independent contractor."

43.     Defendant entered into similar "no poach" agreements with its other clients.

44.     Standard form language used by Sedgwick with other customers is substantially identical to the language used with Client A: "Accordingly, Client agrees that, during the term of the Agreement, and for twelve months thereafter, it will not solicit, contract or hire Sedgwick personnel or encourage them to seek employment or any other contractual arrangements with Client." This agreement with Client B, which is a governmental entity and not a large insurance company like Client A, confirms that Sedgwick's use of "no poach" agreements is widespread and a term that Sedgwick seeks to assert and enforce for customers of all sizes in all lines of business in order to reduce mobility of Sedgwick employees and suppress wages.

45.     Indeed, an analysis of agreements between Sedgwick predecessor in interest York and public entities confirm that the forms used are boilerplate and widespread.

46.     An agreement with York: "PRINCIPAL shall not hire any employee of [Sedgwick] or induce any employee of [Sedgwick] to terminate his or her employment (or encourage, and aid or abet any third party to do the same) at any time during which this Agreement or any extension of renewal thereof is in effect and for a period of twelve (12) months thereafter."

47.     An identical agreement between York and a large California school district: "PRINCIPAL shall not hire any employee of [Sedgwick] or induce any employee of [Sedgwick] to terminate his or her employment (or encourage, and aid or abet any third party to do the same) at any time during which this Agreement or any extension of renewal thereof is in effect and for a period of twelve (12) months thereafter."

48.     Another agreement with York: "Principal shall not hire any employee of [Sedgwick] or induce any employee of [Sedgwick] to terminate his or her employment (or encourage, and aid or abet any third party to do the same) at any time during which this Agreement or any extension of renewal thereof is in effect and for a period of twelve (12) months thereafter

49.     An agreement with York affiliate Bickmore: "CLIENT shall not hire any employee of [Sedgwick] or induce any employee of [Sedgwick] to terminate his or her employment (or encourage, and aid or abet any third party to do the same) at any time during which this Agreement or any extension of renewal thereof is in effect and for a period of twelve (12) months thereafter."

50.     An identical agreement between Bickmore and a consortium of over a dozen California cities: "CLIENT shall not hire any employee of [Sedgwick] or induce any employee of [Sedgwick] to terminate his or her employment (or encourage, and aid or abet any third party to do the same) at any time during which this Agreement or any extension of renewal thereof is in effect and for a period of twelve (12) months thereafter."

51.     As the foregoing provisions apply through "renewal or extension" of the agreements, they are presumably in effect today and enforced by Sedgwick.

52.     As laid out above, the "no poach" agreements used by Sedgwick form a "hub and spoke" web that restrain movement by Defendant's employees such as Khan to customers of any size.

53.     The web that Sedgwick has spun ensures that the most natural routes to professional advancement outside of Sedgwick—to the customers whose business, claims, and policies Sedgwick employees would already have substantial expertise—are foreclosed.

**Concealing the Illegal "No Poach" Agreement**

54.     Defendant hid its "no poach" agreements by touting compliance with relevant laws and regulations in its employee handbooks.

55.     In its July 2023 handbook, Defendant ordered "[c]ompliance with laws and regulations," stating "[employees] must be knowledgeable about the laws and regulations governing our activities and our company policies and comply with their specific terms and intent."

56.     So too in its February 2024 handbook, Defendant required "[c]ompliance with laws and regulations," requiring that employees "be knowledgeable about the laws and regulations governing our activities and our company policies and comply with their specific terms and intent."

57.     Defendant further obfuscated their "no poach" agreement by recasting its terms as a conflict of interest provision in the July 2023 handbook, stating:

Before you accept employment outside of Sedgwick or serve as a director, trustee, officer, owner or partner of any other business organization — regardless of whether you receive compensation — you must first obtain written approval from Sedgwick's Legal Department. Serving in such a role as a volunteer for a non-profit organization does not require approval if there is no actual, potential or perceive[d] conflict.

58.     Curiously, the above clause was omitted from the February 2024 handbook.

59.     Defendant enumerated these deceptions *qua* policies in its handbooks to prevent discovery of its unlawful "no poach" agreements.

60.     Sedgwick further obscured the existence of its "no poach" agreements by touting the measures Sedgwick had taken to ensure the retention of top talent. [5] Sedgwick told its employees that its training and engagement measures were the primary ways of improving retention, and making sure employees did not "look for advancement opportunities elsewhere." Sedgwick told its employees that increasing its knowledge, training, and continuing education were key drivers to retention. Sedgwick did not disclose that its employees' professional growth and development opportunities were, in fact, restricted by "no poach" agreements.

**Internal Equity and Defendant's Compensation Structure**

61.     Defendant designed its compensation structure to achieve parity among employees with commensurate experience. The "no poach" agreements were intended to reduce upward pressure on salary that would come from pay increases that would have been necessary to make sure top talent stayed at Sedgwick and did not leave Sedgwick for a client.

62.     Sedgwick had standardized job titles and a hierarchical organization of its employees, such that junior employees could advance into more senior positions within Sedgwick that come with increased responsibilities and compensation.

63.     Sedgwick describes this "top down" structure as follows: "Employers must foster a growth-minded culture. This is only possible through comprehensive, top-down change and a genuine commitment to the development journey of each of their people. It requires every level of the organization's support for strong execution and holding leaders accountable for developing their teams. Managers should work with their team members to develop individualized growth plans to chart each employee's goals and the skills they need to advance."

64.     Given the concerns for internal equity and parity at Sedgwick, and the hierarchical nature of advancement, there would be upward pressure on salaries and wages if only a handful of Sedgwick employees left Sedgwick for higher paying jobs at customers such as Company A.

---

[5] https://sedgwickpodcast.podbean.com/e/retaining-top-talent/

65.     This "top down" organization and structure enhances the common impact of Sedgwick's "no poach" agreements.

**Relevant Antitrust Market**

66.     As Defendant's agreements are *per se* illegal, and directly suppressed compensation for insurance professionals, it is not necessary to define a relevant antitrust market.

**Defendant Grows at the Expense of Employees Like Mr. Khan**

67.     Defendant dominates its rivals and is the largest provider of TPA services in the United States. According to S&P Global, Defendant "has revenues of approximately $4.5 billion as of the last 12 months ending second quarter 2023" and "has a well-established position as the leading insurance third-party administrator. Through organic and inorganic initiatives over the years, the company has materially diversified its revenue base and successfully broadened its offerings through expanding its core market, specialty and ancillary services, and new and emerging markets. Sedgwick now has over 120 services across its TPA (consisting of casualty, specialty, workforce absence, and managed care)…"[6] Defendant has "maintained its category dominance across most business lines, markets, and regions in which it competes."[7]

68.     Through its "no poach" agreements, Defendant has unfairly restricted the labor market and used its monopsony power to deprive its highly skilled workers of wage growth opportunities and job-to-job mobility.

69.     Defendant and its clients are horizontal competitors in the labor market. These companies compete to hire skilled insurance claims professionals, and related professionals such as engineers, nurses, and IT professionals, which are necessary inputs to both Defendant and its clients' businesses.

70.     The "no poach" agreement does not serve any proper business purpose that is pro-competitive in the relevant labor market. Defendant's agreements with its clients expressly

---

[6] "Sedgwick L.P. Ratings Raised To 'B+' From 'B'; Outlook Stable," S&P Global, Oct. 17, 2023; https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3072195 (last accessed December 5, 2024).
[7] *Id.*

disclaim a "joint venture" or "partnership", and they further state that "nothing in this Agreement shall be construed to create any such relationship between the parties other than that of customer and independent contractor."

71.     Defendant demands this restraint on the labor market on all its business partners, even public entities. Thus, the "no poach" agreement between Defendant and Client A is not a bespoke agreement to benefit Defendant, Client A, and its employees alike; rather, it is a mechanism to control the movement of Defendant's workers and suppress their salaries.

72.     Defendant blanketly imposes its "no poach" restriction as to all workers who have ever worked on the clients' accounts, irrespective of the scope or duration of that particular employee's work on the account or his/her tenure, or the training, if any, provided by Defendant to its workers. The agreements do not have a set termination date, making the "no poach" restriction unlimited in duration.

73.     These use of "no poach" agreements has helped Sedgwick maintain "obscene profits." As noted by one observer: "When Carlyle first acquired its stake in Sedgwick in 2018, the TPA was valued at approximately $6.7 billion. Now, according to reports on Carlyle's pending sale of a minority stake in Sedgwick to Altas Partners, Sedgwick is valued at approximately $13 billion. That's an over $6 billion difference—or an approximately 95% return on investment—for Carlyle in just six years."[8]

**Effects of Defendant's Anticompetitive Agreements on Plaintiff and the Class**

74.     Defendant's "no poach" agreements do not serve the interests of employees because Defendant has no incentive to invest in higher wages, better benefits, and working conditions. In contrast, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment. *See* Herbert Hovenkamp, *Competition Policy for Labour Markets*, OECD (2019),

---

[8] https://blog.daisybill.com/sedgwick-private-equity-makes-obscene-profits

https://one.oecd.org/document/DAF/COMP/WD(2019)67/en/pdf (last accessed December 4, 2024).

75.    Defendant maintains its monopsony power over its employees and manifests this market power in the form of restrictions to employee mobility.

76.    Mobility is a necessary condition for competitive labor markets. Workers who cannot switch jobs have no ability to seek or negotiate better compensation, benefits, or other employment opportunities.

77.    In a properly functioning and lawfully competitive labor market, TPA, insurance and self-ensured insured companies would compete with one another to attract and retain skilled insurance professionals, like Plaintiff. This competition among employers would improve the employees' ability to negotiate for better salaries and other terms of employment with Defendant. The threat of losing employees to its clients would—in a lawfully competitive labor market—encourage Defendant to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees are more likely to seek better compensation elsewhere. If an employee is recruited by another employer (*e.g.*, Client A) and offered better compensation (as was the case with Plaintiff), the current employer (*e.g.*, Defendant) may have to increase compensation to retain that employee and increase compensation for other employees as well. In a competitive labor market, such preventative retention measures thus lead to increased compensation for employees.

78.    Defendant's conspiracy and "no poach" agreements restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets. This, in turn, suppressed the compensation of all employees of Defendant, not just particular individuals who otherwise would have been solicited or sought to change employers.

79. Plaintiff and the proposed Class suffered reduced wages, reduced employment benefits, and loss of professional growth opportunities because of the express agreement to restrain trade among Defendant and its clients. Suppressed wages due to employers' agreement not to compete with each other is injury of the type the antitrust laws are intended to prevent.



The median Sedgwick client pays Senior Claims Adjusters 6% more than Sedgwick does
According to the median of self-reported salaries on Glassdoor



80.     Defendant has maintained this market power by suppressing its employees' salaries with "no poach" agreements entered into with its clients. Defendant has over 30,000 employees. The reported median salaries of employees of Defendant's clients exceed reported median salaries of Defendant's employees.[9] In short, Defendant has achieved its growth on the backs of its employees by keeping their salaries categorically lower than the salaries offered by its clients.

81.     Although the reasons behind the comparatively abysmal pay have been hidden from Sedgwick employees, the fact that Sedgwick lags in compensation is well known. According to analysis from Comparably: "193 employees at Sedgwick rank their Compensation in the Bottom

---

[9] The wage suppression demonstrated in this complaint is illustrative. Further analysis of Defendant's historical salary date is necessary to generate a complete damages model.

20% of similar sized companies on Comparably (based on 569 ratings) while 176 employees at Sedgwick rank their Perks and Benefits in the Bottom 30% of similar sized companies on Comparably (based on 178 ratings)."

82. Plaintiff Khan's experience is typical of that of other class members in that he was denied the opportunity to take a position at Company A that would have increased his compensation by at least 25%.

83. As with other members of the class, Plaintiff Khan's compensation was artificially deflated during his time at Sedgwick because of the collective effect of the web of "no poach" agreements that prevented employee movement to better paying jobs.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Violations of § 1 of the Sherman Act, 15 U.S.C. § 1, et al.)

84. Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding paragraphs, and further alleges against Defendant as follows:

85. Beginning in no later than January 1, 2014 and continuing through present, Defendant entered into and engaged in unlawful contracts in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

86. Defendant imposed the "no poach" restriction with the purpose and effect of eliminating, to a substantial degree, competition for skilled labor.

87. As a direct and proximate result of Defendant's "no poach" agreements to restrain trade and eliminate competition for skilled labor, Plaintiff and members of the Class have suffered injury and continue to suffer injury to their property and have been denied the benefits of free and fair competition and suffered damages in an amount according to proof at trial.

88. Defendant's "no poach" agreements are *per se* violations of Section 1 of the Sherman Act.

89.     In the alternative, Defendant is liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the agreements in question would have an anticompetitive effect on customers and the labor market.

90.     Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and that of the Class by adjudging and decreeing that:

91.     This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

92.     Defendant has engaged in contracts in violation of Section 1 of the Sherman Act, and that Plaintiff and the members of the Class have been damaged and injured in their property as a result of this violation;

93.     The contracts be adjudged and decreed to be *per se* violations of the Sherman Act;

94.     Awarding Plaintiff and the Class damages in the amount according to proof at trial, to be trebled in accordance with the law;

95.     Awarding all actual, general, special, incidental, statutory, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

96.     Granting a permanent injunction enjoining Defendant and signatories to the "no poach" agreements from enforcing or adhering to any existing agreement that unreasonably restricts competition for employees as described herein;

97.     Declaring Defendant be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees;

98.     Judgment be entered against Defendant and in favor of Plaintiff and each Class member for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by Defendant and/or imposing a constructive trust upon Defendant's ill-gotten gains, freezing Defendant's assets, and/or requiring Defendant to pay

restitution to Plaintiff and to all members of the Class of all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent;

99.     Declaring Defendant to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

100.    Awarding pre-judgment and post-judgment interest;

101.    Awarding equitable relief, including a judicial determination that the "no poach" agreements used by Sedgwick are null and void;

102.    Awarding attorneys' fees and costs; and

103.    Granting such further relief that this Court deems appropriate.

## VIII.  JURY DEMAND

Plaintiff demands a jury trial for all claims and issues so triable.

Dated: December 20, 2024              Respectfully submitted,

                                      /s/Michael M. Mulder

                                      Michael M. Mulder (Bar No. 1984268)
                                      **THE LAW OFFICES OF MICHAEL M. MULDER**
                                      1603 Orrington, Suite 600
                                      Evanston, IL 60201
                                      Telephone: (312) 263-0272
                                      mmmulder@mmulderlaw.com

                                      Todd M. Schneider (SBN 158253) (*pro hac vice forthcoming*)
                                      Caroyln H. Cottrell (SBN 166977 (*pro hac vice forthcoming*)
                                      Jason H. Kim (SBN 220279) (*pro hac vice forthcoming*)
                                      Matthew S. Weiler (SBN 236052) (*pro hac vice forthcoming*)
                                      Ori Edelstein (SBN 268145) (*pro hac vice forthcoming*)
                                      Mahzad K. Hite (SBN 283043) (*pro hac vice forthcoming*)
                                      Esther Lee Bylsma (*pro hac vice forthcoming*)
                                      **SCHNEIDER WALLACE**
                                      **COTTRELL KONECKY LLP**
                                      2000 Powell Street

Suite 1400
Emeryville, CA 94608
(415) 421-7100
TSchneider@schneiderwallace.com
CCottrell@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
OEdelstein@schneiderwallace.com
MHite@schneiderwallace.com
EBylsma@schneiderwallace.com

*Counsel for Plaintiff and the Class*